## LEHIGH VALLEY COAL CO. v. WARREK.

(Circuit Court of Appeals, Second Circuit. January 25, 1898.)

No. 29.

1. MASTER AND SERVANT—FURNISHING SAFE TOOLS—FELLOW SERVANTS.
   When a servant has informed his foreman and superintendent that his tools are unsafe, it is their duty to furnish reasonably safe tools, and in so doing they are not his fellow servants, but the master's representatives.

2. SAME—ASSUMPTION OF RISKS.
   When a servant has called attention to the unsafe condition of his tools, and been promised that safer ones will be promptly furnished, he is not, as matter of law, negligent for continuing to use the old ones.

3. SAME.
   A servant engaged in stopping coal cars at a dump by means of blocks, which are ordinarily worn out in about three weeks' use, and who, after expiration of that time, has asked for and been promised new ones, does not assume the risk from using a defective one, where those at hand have become covered with grease and coal dust, so that defects are not easily discoverable, especially in the limited time allowed for choosing while a car is approaching.

This cause comes here on a writ of error to review a judgment of the circuit court, Eastern district of New York, in favor of defendant in error, who was plaintiff below. The action was brought to recover damages for personal injuries sustained by plaintiff while in the employ of defendant (the plaintiff in error) at its coal mines near Wilkesbarre, Pa. It was begun in the supreme court of the state, and removed to the United States circuit court by reason of diversity of citizenship. The jury rendered a verdict in favor of plaintiff for $2,000. The facts sufficiently appear in the opinion.

C. W. Pierson, for plaintiff in error.
F. W. Catlin, for defendant in error.
Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. Plaintiff was assigned to check the speed of certain cars, loaded with coal, running upon a track leading from defendant's mines to a coal dump. The following summary of the evidence is taken from the brief of plaintiff in error: ·

"There were three appliances in use for stopping the cars. One of these was a lever, which threw a plank, situated between the rails, and hinged at one

end, against the bottom of the axle of the car. The second was a sprag, viz. a stick designed to be thrust from the outside between the spokes of a wheel. The third was a block or wedge-shaped piece of wood, which was put on the rail in front of the wheel. Plaintiff had used, and was familiar with, all three appliances. It was in using the third that he was injured. He had been doing the same work for the company at the same place for five or six months, blocking some 500 cars a day during that period. McKaa, the foreman, who employed plaintiff, testified that he did not instruct him when to use the one or the other of the three appliances, but left that to the judgment of the men. Plaintiff, however, testified that he used sprags in wet weather and blocks when it was dry; that the lever could only be used with slow cars, and McKaa had instructed him to use the block (i. e. rather than the lever) if the car was going fast, and that the car which injured him was going fast. It was not claimed that McKaa, or any one else, pointed out to the men just what blocks or sprags they should use. The men picked out their own blocks or sprags. There was a pile of blocks along the track, and plaintiff was accustomed to select his block himself from the pile. At the time of the accident there were other blocks and sprags at hand. According to plaintiff, there were no new blocks on the pile, but plaintiff's foreman testified that some of them were in good condition, and that a block which had become shaped to the wheel was preferable for use to a new one. No accident had ever been known from the use of these blocks. It is a method for stopping cars originally adopted by the men themselves, and now in general use in the collieries in that region. At first the men made their own blocks, but at this time they were ordinarily whittled out at the carpenter shop, situated about 150 or 200 feet from the breaker. When the men wanted blocks they would sometimes go to the carpenter shop in person to get them, and sometimes would fashion blocks for themselves. The docking boss, whose duties kept him within sight of plaintiff, testified that he had seen plaintiff on at least two occasions fashioning blocks for himself, chopping them out of sprags with a hatchet. This, however, was denied by plaintiff. Plaintiff testified that when he wanted new blocks he would notify McKaa, the foreman, and he would have them brought; that the carpenter always brought them; that he ordinarily got new blocks every two or three weeks; that he got the last blocks about four weeks before the accident; that on the Friday before the accident (which happened Monday morning) he notified Mr. McKaa that he wanted new blocks; that on Saturday, when Mr. Shoemaker, the outside superintendent, told him to hurry up, he replied, 'I can't, Mr. Shoemaker; I got old blocks, a little cracked and a little chipped off.' On Monday morning he had blocked five cars before he was hurt. When the sixth car was uncoupled by his companion 50 or 60 feet up the grade, and came towards him, he took a block from the pile, and put it on the rail under the wheel. The block split in two pieces, and the wheel came over his hand. The witnesses were not entirely agreed as to the appearance of the block after the accident. According to Peter Philip, a fellow laborer, who testified through an interpreter for plaintiff: 'Block was split on the bottom, about half or three-quarters of an inch. Inside it was white wood and fresh. * * * It was, in the middle, white and fresh; but from the outside, where the crack was, it was split, and kind of rotten. * * * It was black for about half or three-quarters of an inch in from the outside. On the outside it was cracked, and chipped off, and black.' According to Mr. McKaa, the foreman, the split looked like a fresh break, and from appearances had been made by the flange of the wheel. It showed the mark of the flange. The wood was in good condition, not rotten at all. To same effect, see testimony of docking boss, Kropp. The fact that blocks look old and black does not necessarily indicate that the wood is rotten, because they are used where there is a good deal of oil and coal dust, which blacken the outside, and soak into any check in the wood."

The theory of the plaintiff was that defendant was negligent, because it furnished defective appliances to the plaintiff with which to do his work. Upon this review all contested questions of fact must be resolved in favor of plaintiff, since the jury found for him. In view of the evidence that, whenever plaintiff needed new blocks,

he applied for them to the foreman, whereupon the carpenter brought them; that, so far as plaintiff was informed, there was no stock of new ones from which he could supply himself; that plaintiff; three days before the accident, and again, two days before the accident, called the attention both of the foreman and of the outside superintendent to the condition of the blocks, and asked for sound ones, and that to his request both replied "All right," and the foreman expressly promised to "give him new blocks right away,"—this case is to be distinguished from those cited on the brief; where the plaintiff had a stock of new appliances at hand from which to help himself. Conceding that there was no duty of regular inspection of the tools in use imposed upon the foreman and superintendent, the defendant trusting to the daily inspection of the men who used the tools for information as to their condition of repair, nevertheless, when such information was given to them, they (the foreman and superintendent), not the plaintiff, were the proper agents to fulfill the master's duty in furnishing reasonably safe tools. Touching the furnishing of such tools, they were not fellow servants with defendant, but were the master's alter ego. So, too, when the servant has called attention to the condition of his tools, and been promised that safer ones will be furnished promptly, he is not, as matter of law, to be held negligent for continuing to use the old ones. "When a master has expressly promised to repair a defect, the servant can recover for an injury caused thereby within such a period of time after the promise as it would be reasonable to allow for its performance, and, as we think, for an injury suffered within any period that would not preclude all reasonable expectation that the promise might be kept." Hough v. Railway Co., 100 U. S. 225. The case made by the proof was one for the jury to pass upon.

In the course of the charge the jury were instructed substantially as follows: That the fault complained of was not the method of working the cars, but that the question was as to the safety of this particular block which was furnished to plaintiff to work with; that it was the duty of defendant to furnish him with reasonably safe things to work with; that the jury was to determine whether the block was a reasonably safe one to put there, and for them to leave there for him to use, or whether there was some defect about the block which made it unfit to use; that, if the jury were satisfied on the evidence that the block was defective,—was not a reasonably safe one for plaintiff to use,—and that defendant knew it, or ought, by reasonable diligence in looking after things, to have known it, and that the defect in the block caused plaintiff's injury,—then they might return a verdict for plaintiff, unless they should find that he was in fault somehow in bringing this upon himself. Further on in the charge the judge instructed the jury as follows:

"If you do not find on the evidence that he was guilty of any negligence himself that contributed to this, and find the block was bad, and the defendant ought to have known it, and that caused the injury, then your verdict should be for the plaintiff. * * * If, as I said before, you can see a defect in this block so it wasn't fit to use, that the defendant must or ought to have known of, and they didn't see it, and that that defect, by its being left there to be used, caused this injury to the plaintiff, then return a verdict for the

plaintiff, unless you see that by his own fault in using the block he brought it on himself."

Defendant excepted to this part of the charge upon the theory that "it excluded the elements of assumption of risk by plaintiff, and his duty to satisfy himself of the safety of the blocks he undertook to use"; that it "lost sight altogether of the real question in the case, viz. whether there were any blocks or appliances accessible to plaintiff which were safe"; that the charge "imposed upon defendant the duty of constant inspection and removal of blocks as they became worn or defective"; that the "duty of selecting such as were best adapted for their purpose and rejecting the worn-out and defective rested with the men themselves"; that defendant's "duty was performed when it furnished new blocks when the men called for them"; that all plaintiff had to do when he wanted fresh ones "was to get them, or ask that they be sent." As to imposing any burden of inspection and removal, the objection is unsound, in view of the testimony that plaintiff had reported that the blocks he was using were old, cracked, and a little chipped off, and had been promised new blocks "right away." The jury were warranted in finding that plaintiff did "all he had to do" when he asked that fresh blocks be sent, and that defendant failed to perform its duty in neglecting to furnish new blocks after they had been twice asked for. The argument assumes that the plaintiff had a pile of tools to choose from, some visibly sound, others visibly unsound; and that he is responsible for the selection he made. The evidence does not warrant any such assumption. Soiled and blackened with use, whatever cracks there might be filled with grease and coal dust, the entire outfit of blocks was in a condition which would make it difficult, if not impossible, to distinguish the sound from the unsound. A block with a deep crack might still be tough enough to stand service for a week or two more, while another with a slight one might break asunder under the wheels of the very next car. The outfit of blocks from which plaintiff had to select, their imperfections to some extent thus disguised, had, according to his testimony, been in use four weeks. Ordinarily, he got new blocks every two or three weeks,—from six to ten of them at a time. He had been working there five or six months, blocking some 500 cars a day. Assuming, as defendant contends, that there was no regular time for furnishing new blocks, defendant waiting for the men's request, and they being, in fact, the inspectors of the tools they used, it does not appear that defendant ever disputed the proposition which plaintiff's past requests implied, viz. that after two or three weeks of use the blocks would get in such a condition of disrepair that new ones were necessary. It certainly is not to be assumed that the company furnished new blocks every two or three weeks, although the old ones were still in perfectly sound condition. The evidence warranted a finding that the character of the work called for an outfit of several blocks, scattered along the track, to be seized and used as occasion required. In this respect the case differs from those where a brakeman is furnished with his individual coupling hook, which he has constant opportunity to inspect. The testimony

further warrants the finding that from two to three weeks was the expected life of a block; that at the end of that time some of them might be able to do service for a considerably longer time, but others were in such condition that they were liable to break in the hand of the user; and that they were so coated and discolored with grease and coal dust as to make it extremely difficult to determine which were sound and which unsound, so that the user, compelled by the nature of his employment to choose quickly, or perhaps pick up the one nearest at hand, without opportunity of choice, was exposed to the risk of using an unsafe appliance. Under these circumstances the exception to the charge was unsound.

Defendant contends that the court erred in refusing certain of defendant's requests to charge. As no argument is presented in support of this contention, it may be briefly disposed of. The requests set out on the brief are:

Second request: "If plaintiff was supplied with a number of tools from which he was free to choose, and if he selected one that he knew, or with reasonable care might have known, to be worn out, he was guilty of negligence, and cannot recover."

The court had sufficiently covered this point by instructing the jury that they were to inquire whether the plaintiff was imprudent in doing what he did in taking this block and using it,—whether he "was in fault, under all the circumstances, of what he had to do with, and what he was expected to do, was he in fault in taking this block and using it"? And, further, that he could not recover if "his carelessness in taking this and using it under all the circumstances brought it on himself."

"Fifth request: Where a servant enters upon an employment from its nature necessarily hazardous, he assumes the usual risk and perils of the service, and also those risks which are apparent to ordinary observation."

The court had already covered this point more tersely in the statement:

"You see all the dangers of working there he undertook to stand against; but he didn't agree to work with defective tools."

It seems unnecessary to enumerate in detail the remaining requests. The charge sufficiently covered the case, as may be seen by referring to the excerpts already quoted supra.

Defendant also excepted to the admission of evidence that before the accident plaintiff usually got blocks every two or three weeks. This branch of the case has already been discussed supra. The judgment is affirmed.